UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CARLO VARTINELLI,

                   Plaintiff,                                        Hon. Robert J. Jonker

v.                                                      Case No. 1:06 CV 136

CLAIRE HAMMER, et al.,

                   Defendants.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Defendants' Motion for Summary Judgment.  (Dkt. #37).  Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court recommends that Defendants' motion be **granted in part and denied in part**.


## BACKGROUND

        Plaintiff is a prisoner under the jurisdiction of the Michigan Department of Corrections (MDOC).  Plaintiff is presently incarcerated at the Macomb Correctional Facility, but the incidents giving rise to the present action occurred while Plaintiff was incarcerated at the Lakeland Correctional Facility.  The following allegations are contained in Plaintiff's complaint.

        Following injuries suffered in 1993, Plaintiff began experiencing "acute allergies to the odors of fish products."  (Complaint at ¶ 11).  An April 20, 1998 memorandum, issued by the assistant food service director of the facility in which Plaintiff was then housed, provided that Plaintiff "CAN

NOT come to the chow hall prior to the serving of fish nor during the serving of fish meals," but instead must be permitted to eat in the housing unit.  (Complaint, Exhibit 4A).

On May 27, 1998, Plaintiff was issued a "Medical Detail" which provided that "when fish is being served in the dining hall - [Plaintiff] gets a bagged meal before and during the fish meal." (Complaint, Exhibit 3A).  On June 17, 1998, an assistant deputy warden of the facility where Plaintiff was then incarcerated issued a memorandum providing that due to Plaintiff's "fish allergy" he "will no longer be permitted in Food Services," but must instead consume "ALL MEALS. . .IN THE HOUSING UNIT." (Complaint, Exhibit 4).  On June 22, 1998, Plaintiff was issued another "Medical Detail" which provided (in part) that Plaintiff was to be provided a "no fish diet."  (Complaint, Exhibit 3).

On July 15, 1998, Plaintiff was transferred to the Lakeland Correctional Facility (Lakeland).  (Complaint at ¶ 13).  When he arrived at Lakeland, Plaintiff was in possession of the various medical details and memoranda identified above.  *Id.*  Despite this evidence that Plaintiff experienced an allergic reaction to the smell and/or presence of fish, Lakeland officials "refused to honor previously prescribed medical treatment [for] Plaintiff's serious medical needs."  (Complaint at ¶ 14).

On July 28, 1998, Plaintiff completed a Health Care Request form in which he requested that his previously issued Medical Details be honored by Lakeland officials.  (Complaint, Exhibit 6). On August 12, 1998, Defendant Hammer responded to Plaintiff's request thusly:

> Milk fish can be avoided on your own.  A low fat intake can all be done on your own.  No detail will be issued.  You will called out for diet counseling re weight reduction.

*Id.*

Plaintiff subsequently suffered "several allergic reactions following exposure to fish." (Complaint at ¶ 16).  On February 21, 2000, Plaintiff experienced a severe allergic reaction to fish. (Complaint, Exhibits 7 and 7A).  According to the Prisoner Accident Report form, completed by Resident Unit Officer Douglas Vining, Plaintiff began to experience breathing difficulties after another inmate "cooked fish in unit microwave." (Complaint, Exhibit 7).  As Officer Vining later asserted, when Plaintiff is "around fish he turns red, has a hard time breathing [and] talking" and "has big red welts on different parts of his body." (Complaint, Exhibit 7A).  Officer Vining reported that Plaintiff "appears to be allergic to fish."  Vining further reported that he was aware of eight other prison officials who believed that Plaintiff was "allergic to fish."  *Id.*

On March 10, 2000, Plaintiff met with Defendant Hammer.  (Complaint at ¶ 8).  Plaintiff asked why, in light of the fact that he experiences "sea food allergies," Hammer cancelled his "previously prescribed diets."  Defendant Hammer responded that "we don't do that here, in Lakeland." When Plaintiff asked Defendant Hammer "why she interfered with previously prescribed medical treatment in spite of the fact that [his] illnesses have worsened," she "got upset and ordered" Plaintiff to leave.  The following day Plaintiff submitted a grievance against Hammer.  *Id.*

On April 3, 2000, Plaintiff was examined by Defendant Malatinsky.  (Complaint at ¶ 19; Complaint, Exhibit 11C).  During this examination, Plaintiff asked Dr. Malatinsky why his previously prescribed medical treatment "was suddenly cancelled."  (Complaint, Exhibit 11C).  Defendant Malatinsky informed Plaintiff that this action was taken in retaliation for Plaintiff having provided legal assistance to another inmate.  *Id.*

On April 24, 2000, Defendant Hammer instructed prison officials that "if [Plaintiff] wanted to eat anything. . .[he] will have to go to the chow-hall regardless of [his] allergy to fish odors."

(Complaint, Exhibit 10).  Plaintiff was soon thereafter transferred to another facility in retaliation for pursuing his grievance against Defendant Hammer.  (Complaint at ¶ 17).

Plaintiff asserts that Defendants' conduct violates his Eighth Amendment right to be free from cruel and unusual punishment.  Plaintiff alleges that Defendant Malatinsky denied his request for medical treatment in retaliation for assisting another prisoner with a legal matter.  Plaintiff also asserts that he was transferred from the Lakeland facility in retaliation for pursuing a grievance against Defendant Hammer.  Defendants now move for summary judgment.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986)).

Once the moving party has met its burden of production, the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue

for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324).  While the Court must view the evidence in the light most favorable to the nonmoving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357.  The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252).  The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004).  Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54.  In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

## ANALYSIS

I.          **Retaliation Claims**

A.          Retaliatory Denial of Medical Treatment

As indicated above, Plaintiff asserts that he was examined by Defendant Malatinsky on April 3, 2000. During this examination, Plaintiff allegedly asked Dr. Malatinsky why his previously prescribed medical treatment "was suddenly cancelled." The Court interprets this inquiry as a request by Plaintiff to be permitted to receive his meals in his cell on days when fish is served in the dining facility, as was the case immediately prior to his transfer to the Lakeland facility. According to Plaintiff, Defendant Malatinsky told Plaintiff that his medical treatment was discontinued in retaliation for Plaintiff having provided legal assistance to another inmate. Plaintiff asserts that Defendant Malatinsky's conduct violated his First Amendment right to be free from unlawful retaliation.

The elements of a First Amendment retaliation claim are as follows: (1) Plaintiff was engaged in constitutionally protected conduct, (2) Plaintiff suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by Plaintiff's protected conduct. *See Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)).

1.      Protected Conduct

Subject to legitimate penological restrictions, inmates generally possess the right to obtain legal assistance from other inmates (i.e., jailhouse lawyers). *See McElhaney v. Elo*, 2000 WL 1477498 at *3 (6th Cir., Sep. 25, 2000) (citing *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993)). However, to the extent that a jailhouse lawyer can be said to possess the "right" to assist another prisoner with his legal matters, such "is wholly derivative of the inmate/client's right of access to the courts." *McElhaney*, 2000 WL 1477498 at *3 (citing *Gibbs*, 10 F.3d at 378). Thus, any legal claim

which may arise from the alleged interference in the relationship between a jailhouse lawyer and his "client" belongs to the client, not the jailhouse lawyer.  *See McElhaney*, 2000 WL 1477498 at *3.

In short, inmates generally possess no constitutional right to provide legal assistance to other prisoners.  *See Shaw v. Murphy*, 532 U.S. 223, 225-32  (2001) ("beyond the protection normally accorded prisoners' speech," prisoners possess no right to provide legal assistance to other inmates); *Smith v. Campbell*, 250 F.3d 1032, 1037 n.1 (6th Cir. 2001) ("prisoners do not possess a special First Amendment right to provide legal assistance to fellow inmates").

There exists an exception to this general rule applicable in circumstances in which "the inmate[s] receiving the assistance would otherwise be unable to pursue legal redress."  *VanDiver v. Martin*, 2002 WL 31166925 at *2 (6th Cir., Sep. 27, 2002).  Plaintiff has failed to submit any evidence establishing that he was the only individual able to render such assistance or that there did not exist other reasonable alternatives.  Accordingly, Plaintiff has not established entitlement to this limited exception to the general rule.  *See VanDiver*, 2002 WL 31166925 at *2; *Gibbs*, 10 F.3d at 378.  To the extent, therefore, that Plaintiff was assisting another inmate pursue legal action Plaintiff was not engaged in constitutionally protected conduct.

2.      Adverse Action Which Would Deter a Person of Ordinary Firmness

Plaintiff asserts that Defendant Malatinsky denied him medical treatment (i.e., refused his request to have his meals served in his cell) for an improper retaliatory purpose.  While Defendants assert that Plaintiff's medical condition did not necessitate such an accommodation, the record reveals that Plaintiff earnestly believed that such an accommodation was medically necessary.  In such a

circumstance, the Court finds find that the denial of medical treatment which the prisoner subjectively

believes is necessary can deter a person of ordinary firmness from exercising his constitutional rights.

3.  Causal Connection

Plaintiff must also establish that the adverse action taken against him was motivated, at least in part, by the protected conduct in which he engaged.  In examining this element, Defendant's subjective motivation is at issue, and as has been recognized, while Plaintiff is not subject to a heightened pleading standard, his burden is not trivial.

As courts recognize, retaliation is "easy to allege" and "can seldom be demonstrated by direct evidence." *Huff v. Rutter*, 2006 WL 2039983 at *7 (W.D. Mich., July 19, 2006) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)).  Nonetheless, "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken. *Thaddeus-X*, 175 F.3d at 399 (citations omitted); *see also*, *Desmone v. Adams*, 1998 WL 702342 at *3 (6th Cir., Sep. 23, 1998) ("[a] claim of retaliation must include a chronology of events from which retaliation may plausibly be inferred"). Furthermore, if Defendant demonstrates that he "would have taken the same action in the absence of the protected activity," he is entitled to summary judgment. *Thaddeus-X*, 175 F.3d at 399.

Defendants have consistently maintained that the decision to deny Plaintiff's request to eat his meals in his cell was based on the determination that such was not medically necessary. Furthermore, Plaintiff has introduced no evidence supporting his assertion that Dr. Malatinsky's decision to deny Plaintiff's request to eat in his cell was motivated by the legal assistance Plaintiff was providing to another inmate.  The Court concludes, therefore, that Plaintiff has failed to demonstrate the requisite causal connection between his allegedly protected conduct and Defendant Malatinsky's decision to deny Plaintiff's request to have his meals served in his cell.

In sum, while the alleged denial of medical treatment could serve to deter a person of reasonable firmness, Plaintiff was not engaged in protected conduct and, furthermore, Plaintiff has failed to establish a causal connection between his conduct and the allegedly retaliatory conduct. Accordingly, the Court recommends that Defendant Malatinsky be granted summary judgment as to Plaintiff's retaliatory denial of medical treatment claim.

B.      Retaliatory Transfer Claim

As indicated above, sometime during the year 2000, Plaintiff was transferred from the Lakeland Correctional Facility. Plaintiff asserts that he was transferred in retaliation for pursuing a grievance against Defendant Hammer. Defendants are entitled to summary judgment on Plaintiff's retaliation claim for at least two reasons.

First, Plaintiff has failed to allege or demonstrate that either Defendant was in any way involved with the decision to transfer him from the Lakeland facility. Liability in a § 1983 action cannot be based upon a theory of respondeat superior or vicarious liability, as Plaintiff must instead allege personal involvement by a particular defendant. *See, e.g., Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (liability is not to be found in passive behavior or an alleged failure to act, rather liability must be based upon "active unconstitutional behavior").

Furthermore, while the filing of non-frivolous prison grievances constitutes protected activity, Plaintiff cannot satisfy the other two elements of the retaliation analysis. Plaintiff has failed to demonstrate that he suffered an adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct. Plaintiff has likewise failed to establish the

requisite causal connection between his protected conduct and the allegedly adverse action to which he was subjected.

It is well established that "a prisoner is expected to endure more than the average citizen and enjoys no protected right to remain incarcerated in a given correctional facility." *Hix v. Tennessee Department of Corrections*, 196 Fed. Appx. 350, 358 (6th Cir., Aug. 22, 2006) (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)).  Thus, unless there exist "foreseeable consequences" to a transfer that would inhibit the prisoner's ability to engage in protected conduct, such a transfer does not constitute an "adverse action" for purposes of the retaliation analysis.  *Hix*, 196 Fed. Appx. at 358 (citing *Siggers-El*, 412 F.3d at 701-04).  Plaintiff has submitted no evidence that the decision to transfer him from Lakeland inhibited his ability to engage in protected conduct or otherwise placed him at risk.

Plaintiff must also establish that the adverse action taken against him was motivated, at least in part, by the protected conduct in which he engaged.  Plaintiff has failed to present evidence from which a reasonable person could conclude that he was the subject of improper retaliation.  Instead, Plaintiff has simply alleged in wholly conclusory fashion that Defendants subjected him to improper retaliation.  Such allegations fail to satisfy the relevant standard.  *See, e.g., Brown v. Gerth*, 2007 WL 2480526 at *7 (W.D. Mich., June 6, 2007) ("[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial").  Accordingly, the Court recommends that Defendants Hammer and Malatinsky be granted summary judgment as to Plaintiff's retaliatory transfer claim.

II.            **Eighth Amendment Claims**

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976).  Accordingly, the Eighth Amendment protects against the unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs."  *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001).

The analysis by which Defendants' conduct is evaluated consists of two-steps.  First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious.  In this respect, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  If the objective test is met, the Court must then determine whether the officials possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.*

In other words, Plaintiff must establish that Defendants "actually knew" that he "faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it."  *Howard v. Calhoun County*, 148 F.Supp.2d 883, 888-89 (W.D. Mich. 2001) (citing *Farmer*, 511 U.S. at 847).

A.      Defendant Malatinsky

The only Eighth Amendment claim asserted against Defendant Malatinsky concerns the doctor's April 3, 2000 examination of Plaintiff.  During this examination, Plaintiff allegedly requested that Defendant Malatinsky issue a medical detail permitting Plaintiff to receive his meals in his cell on days when fish is served in the dining facility.  According to Plaintiff, Dr. Malatinsky refused his request.

Defendant Malatinsky does not deny that he examined Plaintiff on April 3, 2000.  (Dkt. #38, Exhibit K at 35).  Defendant Malatinsky asserts, however, that during this examination Plaintiff did not discuss his alleged food allergies.  *Id.*  Defendant Malatinsky's assertion is consistent with the medical record, which indicates that Plaintiff met with Defendant Malatinsky on this date for purposes of obtaining treatment for pain in his lower back and hip.  (Dkt. #38, Exhibit F).

To avoid summary judgment Plaintiff "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial."  In response to Defendant Malatinsky's submissions, Plaintiff has failed to submit any evidence.  Plaintiff asserts that he "testified to facts sufficient to establish that Dr. Malatinsky was deliberately indifferent to his medical condition."  The Court notes, however, that Plaintiff has failed to submit the portions of Plaintiff's deposition testimony which allegedly support such.  Plaintiff should be given 10 days from the date of this Report and Recommendation to submit the portion of the transcript of any testimony supporting this claim.  If Plaintiff fails to come forward with such evidence, the Court recommends summary judgment be entered on Plaintiff's claim against Defendant Malatinsky in its entirety.

### B.    Defendant Hammer

Plaintiff's allegations against Defendant Hammer involve several distinct incidents, each of which is described below.

### 1.    August 12, 1998

Following his transfer to the Lakeland facility, Plaintiff requested that his previously issued medical details and dietary accommodations be honored by the Lakeland staff.  On August 12, 1998, Defendant Hammer rejected Plaintiff's request, concluding that Plaintiff could simply avoid fish on his own.  Plaintiff alleges that he thereafter experienced "several allergic reactions following exposure to fish."

While Plaintiff's allegations state a claim for deliberate indifference to his serious medical needs, this claim was previously dismissed for failure to comply with the relevant statute of limitations. *Vartinelli v. Moskalik*, Case No. 1:03-cv-323, dkt. ## 50, 59 (W.D. Mich.).  A dismissal for failure to comply with the relevant statute of limitations constitutes "a decision on the merits for claim preclusion purposes."  *Mitchell v. Chapman*, 343 F.3d 811, 820 (6th Cir. 2003).  Pursuant to Federal Rule of Civil Procedure 8(c), the defenses of estoppel, res judicata, or statute of limitations must be affirmatively plead.  Defendants have affirmatively plead such.  (Dkt. #15).  Accordingly, the Court recommends that Defendant Hammer be granted summary judgment as to this particular claim.

### 2.    March 10, 2000

On March 10, 2000, Plaintiff met with Defendant Hammer.  Plaintiff asked why, in light of the fact that he experiences "sea food allergies," Hammer cancelled his "previously prescribed diets."

Defendant Hammer responded that "we don't do that here, in Lakeland." The Court interprets Plaintiff's inquiry as a request to be afforded a fish-free diet and that he also be permitted to eat in his cell on those days that fish is served in the dining facility, as was the case immediately prior to his transfer to the Lakeland facility.

        3.      April 24, 2000

According to Plaintiff's medical records, on April 24, 2000, he informed the food services supervisor that he "cannot eat the tuna casserole tonight." (Dkt. #45, Exhibit S). This information was forwarded to Defendant Hammer, who instructed the food services supervisor to "serve diet as written making no substitute for the tuna casserole since 'no fish' not on detail." Defendant Hammer further instructed the food services supervisor that "Prisoner can choose not to eat." When the food services supervisor asked whether Plaintiff was to receive "meals in on fish days," Defendant Hammer responded that "prisoner has no medical detail for this and there is no medical indication for it." *Id.* As the Court has previously concluded on two occasions, the record in this matter reveals that there exist genuine factual disputes which preclude granting Defendant Hammer's motion for summary judgment.

Medical records submitted by Plaintiff reveal the following regarding his medical condition prior to his transfer to the Lakeland facility. On August 24, 1994, Plaintiff experienced itching and shortness of breath as a result of "food allergies." (Dkt. #45, Exhibit C). On September 8, 1994, Plaintiff reported to sick call to obtain treatment for a rash caused by food allergies. *Id.* On May 16, 1995, Plaintiff reported that he was allergic to fish, peanut butter, and dairy products. (Dkt. #45, Exhibit

E).  Plaintiff reported that he often skipped meals to avoid encountering those foods to which he was allergic.  *Id.*

On April 10, 1998, Plaintiff was prescribed a "Medical Detail" which provided that he was to receive a "no fish diet."  (Dkt. #45, Exhibit J).  This detail was scheduled to expire on July 10, 1998.  *Id.*  On April 11, 1998, Plaintiff experienced an allergic reaction after merely being exposed to fish in the dining facility.  (Dkt. #45, Exhibit G).  On April 20, 1998, the assistant food services director of the facility in which Plaintiff was then incarcerated issued a memorandum which stated that Plaintiff "CAN NOT come to the chow hall prior to the serving of fish nor during the serving of fish meals," but instead must be permitted to eat in the housing unit.  (Dkt. #45, Exhibit H).  The memorandum further provided that Plaintiff was to enjoy this accommodation "until further notice."  *Id.*

On May 16, 1998, Plaintiff experienced an allergic reaction ("hives, flushing, thickness of lips, tongue") after being exposed to fish which his bunk mate brought to their cell.  (Dkt. #45, Exhibit G).  On May 27, 1998, Plaintiff was prescribed another "Medical Detail" which provided that "when fish is being served in the chow hall - [Plaintiff] gets a bagged meal before and during the fish meal." (Dkt. #45, Exhibit J).  This detail was scheduled to expire on August 27, 1998.  *Id.*  On June 19, 1998, Plaintiff met with a dietician who worked at the facility in which he was then incarcerated.  (Dkt. #45, Exhibit I).  The dietician concluded that Plaintiff was allergic to fish.  The dietician instructed, therefore, that Plaintiff receive a "fish free" diet and that he be permitted to eat "all meals. . .in the housing unit." *Id.*  On June 22, 1998, Plaintiff was prescribed another "Medical Detail" which provided that he be afforded a "no fish diet."  (Dkt. #45, Exhibit J).  This detail was scheduled to expire on September 22, 1998.  *Id.*  On July 11, 1998, Plaintiff experienced an allergic reaction after merely being exposed to fish.  (Dkt. #45, Exhibit K).  On July 14, 1998, the medical staff at the facility in which

Plaintiff was then incarcerated completed a "Health Review for MDOC Transfer" form.  (Dkt. #45, Exhibit L).  In the section entitled "Prisoner's Health Needs," the medical staff reported that Plaintiff "has allergy to fish & fish smells."  *Id.*

Thus, when Plaintiff arrived at the Lakeland facility, on July 15, 1998, Defendant Hammer should have known that Plaintiff's health was potentially threatened by the mere exposure to fish.  Plaintiff's medical record was replete with evidence that Plaintiff experienced an allergic reaction when exposed to fish.  Moreover, contrary to Defendant Hammer's assertions, this evidence did NOT consist merely of reports of Plaintiff's subjective allegations.  As discussed immediately above, the *medical staff* at the facility in which Plaintiff was then incarcerated concluded (on multiple occasions) that Plaintiff was allergic to fish.  As a result, medical professionals *prescribed* that Plaintiff be afforded a fish free diet and, moreover, be permitted to receive his meals in his cell.  Nonetheless, when Plaintiff transferred to Lakeland his requests to maintain the still current Medical Details described above were rejected.  Plaintiff's request to eat in his cell was rejected and instead Plaintiff was instructed simply to "not ingest fish if [he] goes to chow hall."  (Dkt. #45, Exhibits K and M).  Defendant Hammer cancelled Plaintiff's Medical Details, having concluded that Plaintiff could simply avoid fish on his own.  (Dkt. #45, Exhibits P, Q, and R).

Plaintiff alleges that he subsequently suffered "several allergic reactions following exposure to fish."  This assertion is supported by several affidavits executed by Plaintiff's fellow prisoners.  (Complaint at Exhibits 13, 13A, and 14).  For purposes of the present motion the Court shall assume that Defendant Hammer was not aware of the facts asserted in these affidavits.  However, on February 21, 2000, Plaintiff experienced a severe allergic reaction to fish which was documented in his prison file.

-17-

On this date, Plaintiff began to experience breathing difficulties after another inmate cooked fish in a microwave oven. (Complaint, Exhibits 7 and 7A). According to the Prisoner Accident Report form, completed by Resident Unit Officer Douglas Vining, Plaintiff began to experience breathing difficulties after another inmate "cooked fish in [a] unit microwave." (Complaint, Exhibit 7). As Officer Vining later asserted, when Plaintiff is "around fish he turns red, has a hard time breathing [and] talking" and "has big red welts on different parts of his body." (Complaint at Exhibit 7A). Officer Vining reported that Plaintiff "appears to be allergic to fish." He further reported that he was aware of eight other prison officials who believed that Plaintiff was "allergic to fish." *Id.*

Thus, when Plaintiff met with Defendant Hammer on March 10, 2000, Defendant Hammer should have known that Plaintiff's health was seriously threatened by the mere exposure to fish. The overwhelming evidence of this notwithstanding, Defendant Hammer again rejected Plaintiff's request to receive a fish-free diet and to eat in his cell on those days that fish is served in the dining facility. Likewise, Defendant Hammer should have known that when she instructed the food services supervisor, on April 24, 2000, to serve Plaintiff tuna casserole that such could have resulted in Plaintiff experiencing severe consequences to his health.

The evidence discussed immediately above is more than sufficient to deny Defendant Hammer's motion for summary judgment. However, Plaintiff has also submitted substantial portions of Defendant Hammer's deposition testimony, the contents of which further underscore that summary judgment is utterly inappropriate in this matter.

Defendant Hammer testified that it was possible for a person who is allergic to fish to experience an allergic reaction merely by being in the same room as fish.[1] (Dkt. #45, Exhibit N at 34).

---

[1] Dr. Lawrence Hennessey, Defendant's expert witness, submitted an affidavit in which he acknowledges that "inhalation of food particles" can trigger an allergic reaction. (Dkt. #48, Exhibit 1).

Hammer testified that she rejected Plaintiff's request to eat in his cell, despite Plaintiff's repeated assertion (and the medical evidence supporting such) that the smell of fish causes him to experience an allergic reaction. *Id.* at 37. Hammer justified her decision in this regard by asserting that she had never personally witnessed Plaintiff suffer an allergic reaction to fish. *Id.* at 37-38. Defendant Hammer maintained that Plaintiff could "avoid fish on his own" without need for a Medical Detail or special diet. *Id.* at 60. When Hammer was asked how Plaintiff (in the absence of a Medical Detail) was supposed to avoid fish on the days that it was served in the dining facility, Defendant Hammer responded that Plaintiff's options were to (a) eat his meal in the dining facility and risk suffering an allergic reaction; (b) purchase food on his own through the prison store; or (c) simply not eat. *Id.* at 60-61.

Defendant Hammer testified that she was not qualified to diagnose whether Plaintiff was suffering from a food allergy. (Dkt. #45, Exhibit N at 15). Despite acknowledging this, Hammer testified that she would not honor a dietary restriction prescribed by a medical professional unless she, in her own independent judgment, determined that there existed "objective information" to support such treatment. *Id.* at 16-19, 65. Defendant Hammer testified that the only objective test that she would recognize as valid was a RAST test. *Id.* at 19. She further testified that in the absence of a positive RAST test she would not honor a care provider's prescribed treatment of food avoidance. *Id.* at 19-21. Defendant Hammer testified that she could have recommended that Plaintiff be administered testing to confirm whether he was experiencing an allergic reaction to fish. *Id.* at 67-68. Hammer acknowledged, however, that she never made any such recommendation.[2] *Id.* at 38-39, 52.

_____

[2] The Court notes that when Plaintiff (in 2002) requested that he be administered a RAST test, his request was denied on the grounds that administration of such a test was not "medically necessary." (Complaint at Exhibit 18A). The Court recognizes that events which occurred in 2002 are beyond the scope of this action. Nonetheless, the MDOC's refusal to administer to Plaintiff the only test that Defendant Hammer recognizes as valid seems to epitomize the way in which the MDOC and Defendant Hammer have responded to Plaintiff's medical concerns.

The Court recognizes that this would be a much different case if Defendant Hammer had cancelled Plaintiff's Medical Details and otherwise rejected his requests to eat in his cell out of a belief that such would endanger Plaintiff's health. There exists, however, no evidence that Defendant Hammer acted out of a concern for Plaintiff's health. This would likewise be a much different case if Defendant Hammer had *negligently* failed to diagnose or properly treat Plaintiff. Such is not the case, however. Instead, the evidence submitted by Plaintiff (especially Defendant Hammer's own testimony) reveals that Defendant Hammer unilaterally made the decision to ignore the documented evidence that Plaintiff experiences an allergic reaction to the smell of fish. Defendant Hammer rejected the medical treatment prescribed by licensed medical professionals simply because she did not agree with it. Hammer made these decisions despite admitting that she lacks the qualifications to diagnose whether a patient is suffering from food allergies.

Defendant Hammer has advanced several arguments in support of her motion for summary judgment, none of which advance her cause. Defendant Hammer first finds it significant that Plaintiff occasionally purchased canned tuna from the prison store. Defendant has submitted no evidence that Plaintiff ever consumed (or was exposed to) this tuna. On the other hand, Plaintiff has presented evidence that he purchased tuna as a means by which to repay other prisoners for providing him with food when he was deprived of food due to Defendant Hammer's disregard of his medical needs. (Complaint, Exhibit 13; Dkt. #45 at 20; Dkt. #45, Exhibit B at 45-46).

According to Defendant Hammer, Plaintiff (at an unspecified date) was "given a medical detail allowing him to be placed in a non microwave unit." Defendant Hammer finds it significant that Plaintiff - in March 2005 - requested to be removed from this non-microwave housing unit. Defendant Hammer wonders why Plaintiff would make this request if exposure to fish (which presumably occurs

in the microwave accessible housing units) allegedly causes him to experience severe allergic reactions. While this is perhaps a legitimate question, such is of no consequence in the present matter, as this particular incident occurred in 2005, well after the time period relevant in the present matter. Thus, the Court fails to discern the significance of this event.

Defendant Hammer next asserts that Plaintiff twice refused RAST testing in 2005. Defendant suggests that such undercuts Plaintiff's assertion that he is allergic to the smell of fish. While Plaintiff's refusal might be relevant had it occurred during the time period relevant in this matter, the fact is that Plaintiff had refused no such test when Defendant Hammer engaged in the conduct which gives rise to Plaintiff's claims. In fact, as noted above, when Plaintiff requested that he receive a RAST test in 2002, the MDOC denied the request on the grounds that such was not medically necessary.

In support of her motion for summary judgment, Defendant Hammer has also submitted a letter authored by Dr. Hennessey. As the Court recently determined, it will not consider Dr. Hennessey's letter in resolving Defendants' motion for summary judgment, as such does not comply with Federal Rule of Civil Procedure 56. (Dkt. #60).

None of the arguments or evidence advanced by Defendant Hammer comes close to establishing the absence of a genuine issue of material fact regarding Plaintiff's Eighth Amendment claims against her. In sum, the evidence submitted by Plaintiff supports the conclusion that Defendant Hammer knew that exposing Plaintiff to fish subjected him to "a substantial risk of serious harm," but that she nonetheless "disregarded that risk by failing to take reasonable measures to abate it." Plaintiff's allegations and evidence, if believed, establish a textbook case of deliberate indifference. In other words, Plaintiff has submitted sufficient evidence to support the conclusion that Defendant Hammer was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United

States Constitution. Accordingly, the Court concludes that Defendant Hammer is not entitled to summary judgment as to Plaintiff's Eighth Amendment claims arising out of incidents occurring on March 10, 2000, and April 24, 2000.


## CONCLUSION

For the reasons articulated herein, the Court recommends that Defendants' Motion for Summary Judgment, (dkt. #37), be **granted in part and denied in part**. Specifically, the Court recommends that Defendant Malatinsky's motion for summary judgment be **granted** unless Plaintiff includes evidence in his objections raising a question of fact.. The Court further recommends that Defendant Hammer's motion for summary judgment be **denied** as to Plaintiff's Eighth Amendment claims arising out of incidents occurring on March 10, 2000, and April 24, 2000, but **granted** as to the remainder of Plaintiff's claims.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date: May 22, 2008                          /s/ Ellen S. Carmody
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge